IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| DONALD G. MYERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 06-3058-CV-S-ODS |
| ) | |
| JO ANNE BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION
DENYING DISABILITY INSURANCE BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application for disability benefits under Title II of the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in December 1959 and has a high school education. He served in the Army from May 1980 until October 1987, where he worked as a medic and a respiratory therapist. While stationed in Germany in the Fall of 1982, Plaintiff was in an accident involving a personnel carrier. The resulting injuries affected his ability to be promoted, so he cut short his planned military career. R. at 609. In September 1988 he began work as a respiratory therapist at a hospital in Springfield, Missouri. In approximately October 1995 Plaintiff was involved in an automobile accident , and six months later he quit his job "citing medical reasons." R. at 597. In early 2002 he worked part time at a business that cleaned restaurant equipment, then in April 2002 opened his own cleaning company to do the same business. Plaintiff's business closed in May 2003. R. at 599-600.

Plaintiff has applied for benefits under Title II, alleging he became disabled on April 15, 1996 (the day he stopped working at the hospital).[1] His insured status expired on September 30, 2002, so the discussion necessarily focuses on his condition between those two dates.

While Plaintiff's testimony suggests he stopped working at the hospital due to the aftereffects of his October 1995 car accident, there are no medical records about that accident. On September 11, 1995, Plaintiff went to a doctor at St. John's Physicians and Clinics ("P&C") complaining of back discomfort resulting from an attempt to lift an attic fan; he was treated and released to return to work on September 19, 1995. R. at 268. He returned in April 1996 with a variety of complaints, primary of which was chronic elbow pain attributed to another incident while in the Army. He reported "a lot of back and neck problems," but nothing specific. The primary treatment related to his elbow, which was x-rayed. R. at 265, 268. His spine was also x-rayed, and the findings were normal. R. at 266-67. On July 16, 1996, Plaintiff went to P&C complaining of "chronic pain in his neck, right knee, right elbow and left foot." With regard to his neck, Plaintiff reported some restriction of movement and popping and cracking when he rotated his neck. He also complained his knee swelled if he engaged in "a lot of activity." R. at 261. Upon examination, his neck was supple with mild tenderness, limits on range of motion and discomfort. The examining physician also noted popping noises during the range of motion tests, but no trigger points were identified. The examination revealed no problems and a full range of motion with Plaintiff's back. R. at 263.

A CT scan performed on Plaintiff's spine on July 29, 1996, revealed no fractures or erosion. "There is somewhat of a rotation to the left of the upper cervical spine, which could be related to patient positioning and/or muscle spasm. No evidence of spinal stenosis is identified. No definitely significant degenerative change is seen. . . . No definitely significant abnormality is identified." R. at 257.

---

[1] The ALJ determined Plaintiffs' earnings from his jobs as a mechanic and a cleaning assistant and from his own cleaning company were too low to qualify as substantial gainful activity. R. at 18.

2

On September 26, 1996, having previously been advised he needed arthroscopic surgery on his knee, R. at 251, 254, Plaintiff sought a second opinion from an orthopedic surgeon, Dr. Richard Seagrave. Plaintiff complained of lingering pain in his knee related to yet a different incident while he was in the Army. He told Dr. Seagrave he had trouble off and on that had increased recently because he "had been mowing lawns and so forth." Dr. Seagrave opined Plaintiff might have a torn meniscus even though the knee appeared benign upon examination, and suggested arthroscopy to confirm and, if necessary, repair the tear. R. at 532. Surgery was successfully performed on October 15. R. at 528-31.

On December 2, 1996, Plaintiff saw Dr. Robert Scott at P&C; he reported "doing better" but was still experiencing headaches and tenseness in his neck and jaw. He also told Dr. Scott the medication he had been taking (Paxil and Trazadone) had provided significant help. Dr. Scott indicated Plaintiff "[p]ossibility [has] some type of firbromyalgia pattern" but did not make a formal diagnosis; instead, he told Plaintiff to return in three months. R. at 249. Plaintiff returned on March 3, 1997, at which time Dr. Scott diagnosed his headaches as "probably common migraine" and "[p]robable fibromyalgia." However, no testing for trigger points is documented. Dr. Scott prescribed Imitrex for the headaches and Soma for muscle spasms and scheduled another appointment for July. R. at 247. At the July appointment, Plaintiff reported no real changes in his condition, but it does not appear Dr. Scott altered the course of treatment. R. at 246-47. On January 15, 1998, Plaintiff reported "still having a lot of problems" and that his "back and fibromyalgia hurt. He did get some medicine when in the Philippines called Ponstil and that has helped him more than anything else." Dr. Scott told Plaintiff to continue taking the Ponstil as well as Paxil, Trazosone, and Klonopin, and directed him to return in a year. R. at 246. Plaintiff went to P&S at other times during 1998, but they were for temporary illnesses unrelated to his disability claim.

Plaintiff next saw Dr. Scott on January 15, 1999. "He said that he started working as a mechanic in December and was more active and having more difficulty with his knee aching, hurting and other joints hurting. Otherwise he has felt well and his review of symptoms is negative. The headaches have not been too bad." R. at 231.

3

Examination of Plaintiff's back revealed "[n]o spinal tenderness [or] spinal deformity and range of motion was normal." Plaintiff also exhibited "normal strength, tone and muscle mass. There was no weakness, rigidity, atrophy, cogwheeling or tremor." R. at 229. Apart from an appointment for treatment of an apparent ear infection, Plaintiff's next appointment was on January 17, 2000. Examination revealed "normal mobility" in his neck, R. at 225, and no tenderness or limitation on range of motion in his back. R. at 224.

On November 30, 2000, Plaintiff went to Witt Chiropractic Center for the first time, complaining of neck and back pain that began five days prior. Plaintiff demonstrated a decreased range of motion, tenderness over the C7-T1 area, and sensory changes in the left forearm and at C6-7. R. at 289. X-rays revealed degenerative disc disease, which was the suspected cause of Plaintiff's pain. R. at 288-89. Plaintiff appeared almost daily until December 8, at which time the chiropractor arranged for an MRI and told Plaintiff "to continue with stretches, as we talked about." R. at 285. The MRI revealed no abnormalities from C1-2 through C5-6 and C7-T1, but at C6-7 revealed a bulging disc and "a small left lateral disc protrusion. . . . There is no significant narrowing of the thecal sac." R. at 282; see also R. at 215-17.[2] Apparently, Dr. Scott saw the MRI; on December 18 he wrote Plaintiff a letter indicating the MRI of his spine showed "some narrowing with a disc bulge and protrusion on the left at levels between vertebra #6 and #7. This was fairly small. Hopefully, this will resolve on its own." R. at 221. On December 29, Plaintiff told the chiropractor he would commence going to the VA for treatment, and there are no further records from Witt Chiropractic Center. R. at 284.[3]

---

[2]According to a website maintained by the National Pain Foundation, the thecal sac is surrounds the spinal cord and is located between the spinal cord and the epidural space. http://www.painconnection.org/MyTreatment/articles/Back_TO_Surgery.asp (last visited November 14, 2006).

[3]For that matter, the Court is unable to locate any relevant records from the VA. Most of the VA records – including those referred to by Plaintiff – relate to an operation he underwent while in the service for left testicular varicocele repair; the Army assigned Plaintiff a disability rating of 10% effective November 3, 1998. E.g., R. at 140-42. The

4

Plaintiff's next visit to Dr. Scott occurred on March 29, 2001. He reported that his neck and back pain were his most significant problems; he had pain and stiffness in his back and his neck hurt when he turned. Dr. Scott found significant decrease in Plaintiff's ability to bend and rotate his neck, but nothing significant regarding his back. He prescribed ibuprofen and Flexeril. R. at 201-03.

Plaintiff returned to P&C on June 26, 2001, at which time he began seeing Dr. Jay Sparks. Plaintiff described persistent discomfort upon little exertion, and Dr. Sparks diagnosed Plaintiff as suffering from tension headaches, fibromyalgia and chronic back pain. R. at 322. At Dr. Sparks' recommendation Plaintiff embarked on an eight-week program of physical therapy. On August 3, Plaintiff reported "his lumbar spine has improved to the degree that it is not a constant aggravation," but at the end he reported little help or improvement. R. at 318-20. Plaintiff did not attend the fibromyalgia program Dr. Sparks suggested. R. at 195. On September 15, Plaintiff reported doing "relatively well" and did not register any complaints about back pain. He indicated the medication Dr. Sparks had prescribed (Mobic) was helpful, but unfortunately was not covered by Plaintiff's insurance. Dr. Sparks prescribed an alternative medication. R. at 314.

There is no record of Plaintiff visiting Dr. Sparks again until December 2002. Plaintiff was involved in another automobile accident in November 2002. In September 2004, Dr. Sparks prepared a Medical Source Statement Physical indicating Plaintiff had the ability to lift five pounds frequently and ten pounds occasionally, stand or walk a total of two hours per day and five minutes at a time, sit a total of three hours a day and for five minutes at a time, could never climb or crawl and only occasionally balance, stoop, kneel, crouch, reach, handle, or use his fingers. He described Plaintiff as suffering from advanced disc disease that was "fluctuating [and] has an unpredictable course and response to rest and activity. Constantly seeking a comfortable position." R. at 371-74.

---

only reference to a spinal examination appears to be from February 20, 1993. This is well before the alleged onset date, and the radiographer noted no abnormalities or infirmities. R. at 153.

5

During the hearing, Plaintiff testified an orthopedist (Dr. Todd Harbach) told him in May of 2003 he saw evidence of an "old" fracture at T1. R. at 596-97. Dr. Harbach's written record reflects his belief Plaintiff suffered this fracture while in the Army. R. at 332. He also described the fracture as "stable." R. at 341. Plaintiff testified he viewed Dr. Harbach's finding as validation for his claim that his "back was broken for several years . . . ." R. at 596.

Plaintiff also testified he looked for work after leaving his job with the hospital, but they did not "pan out because they were more physical that what I was able to do." This was a reference to Plaintiff's work as a mechanic's assistant and restaurant cleaner. R. at 599. There is no indication Plaintiff sought or obtained less strenuous work. He reported experiencing pain in September 2002 nearly all over his body, but particularly his head, lower back, and right leg. He also experienced numbness and weakness in his leg. He used a cane around the house but not outside the home. R. at 607-09. He rated the pain he experienced in his neck in 2000 as seven or eight out of ten on a good day, "and on a frequent day it's, it was just unbearable." R. at 609. He reported nerve damage in his right elbow from his Army experience that limits his ability to write. R. at 611-13. Stretching and raising his arms above his head, and sometimes steering a car irritates his elbows and arms. R. at 614. A day could not pass without him needing to recline for part of the time, and he routinely sat with his feet up for five to six hours a day. R. at 618-19.

A vocational expert ("VE") also testified. When asked to assume a person of Plaintiff's age, education and experience with the restrictions described on Dr. Sparks' Medical Source Statement, the VE testified such a person could not complete an eight-hour workday. R. at 622. When asked to assume the person could lift twenty pounds occasionally and ten pounds frequently, stand and walk six hours a day, sit six hours a day, who could occasionally push, pull, stoop, bend, squat, kneel, crawl, climb or balance and who needed to avoid frequent or repetitive overhead reaching, extreme vibration, heights, and hazardous or moving equipment, the VE testified such a person could not return to his past relevant work. However, such a person could perform light, unskilled work such as office worker and housekeeper. R. at 623. Upon questioning

6

from Plaintiff's attorney, the VE testified the person in the second hypothetical could not perform any work in the national economy if he (1) could use his hands for only five to ten minutes out of every hour, (2) needed to be absent approximately once every ten days, or (3) needed ten to sixteen bathroom breaks of unpredictable duration. R. at 623-24.

The ALJ found Plaintiff experienced pain, but did not believe it was as extreme as Plaintiff testified. He reached this conclusion based on a variety of factors, including inconsistencies (1) between Plaintiff's testimony about the relevant time period and his statements made to physicians during that time period and (2) inconsistencies between Plaintiff's testimony about the relevant time period and his physicians' assessments during that time period. He discounted Dr. Sparks' Medical Source Statement because it did not specify that it applied to Plaintiff's condition in the relevant time period (as opposed to the time it was prepared, which was nearly two years after Plaintiff's insured status expired). Moreover, even if the Medical Source Statement was meant to describe Plaintiff's functional capacity before September 2002, it was suspect because it was inconsistent with Dr. Sparks' contemporaneous treatment records. The ALJ concluded his second hypothetical question posed to the VE accurately described Plaintiff's functional capacity during the relevant time period, and based on the VE's answers the ALJ concluded Plaintiff retained the ability to perform work in the national economy.

## II. DISCUSSION

Plaintiff presents three arguments, all of which are specific arguments alleging the Commissioner's final decision is not supported by substantial evidence in the Record as a whole. "Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider

evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>    1.  The claimant's daily activities;
>    2. the duration, frequency and intensity of the pain
>    3. precipitating and aggravating factors;
>    4. dosage, effectiveness and side effects of medication;
>    5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The Court accepts Plaintiff's argument that his subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. However, the credibility determination is to be made by the ALJ, and the Court's review of the Record reveals sufficient evidence to justify the ALJ's determination in this case. While not determinative, the lack of medical evidence is a factor that can be considered. Here, repeated examinations of Plaintiff's back failed to identify any serious maladies. Plaintiff generally reported medication provided him with some relief, and narcotic medication was never prescribed. Lack of strong pain medication is inconsistent with subjective complaints of disabling pain. See Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994). Plaintiff never told his doctors he was as limited as he described in his testimony, and none of his doctors recommended that he limit his activity to the degree he described. For instance, in discussing matters with his doctors, Plaintiff consistently described his inability to perform strenuous physical activity, but never disclaimed an ability to sit. These inconsistencies justified the ALJ's finding that Plaintiff's pain existed but was not disabling during the relevant time period.

Plaintiff also points to medical records from examinations after the relevant time period, including particularly those following his November 2002 car accident. Understandably, these records focus on (or at least include consideration of) that accident, and therefore cannot be understood as describing Plaintiff's condition prior to September 30, 2002.

Finally, Plaintiff contends the ALJ failed to accord proper deference to Dr. Sparks' Medical Source Statement. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). There are several factors justifying the ALJ's decision not to rely on Dr. Sparks' statement. The statement was prepared nearly two years after Plaintiff's insured status expired, and contains no indication that it is intended to describe Plaintiff's condition prior to that time. In contending otherwise, Plaintiff encounters

another inconsistency: the limitations described in the statement are not supported by Dr. Sparks' notes from the relevant time period. In other words, even if the statement is intended to describe Plaintiff's functional capacity while he was insured, the statement is contradicted by the contemporaneous treatment notes from that time period; hence, the statement is not worthy of deference.

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). This is a factual determination to be made by the Commissioner, and to which this Court must defer so long as the determination is supported by substantial evidence in the record as a whole. There is some evidence supporting Plaintiff's position, but there remains substantial evidence supporting the Commissioner's decision. The Court cannot substitute its view of the facts for the Commissioner's.

### III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: November 21, 2006  UNITED STATES DISTRICT COURT